OPINION OF THE COURT
Judith J. Gische, J.
Petitioner is the owner and developer of real estate located at 377 Greenwich Street, New York, New York. It brings this CPLR article 78 petition to challenge an October 5, 2005 decision by the New York State Department of Environmental Conservation (DEC) denying its application to participate in the Brownfield Cleanup Program (BCP). DEC opposes the petition.
As part of its opposition, DEC included affidavits from Daniel C. Walsh (DEC Chief of Region 2 Hazardous Waste Remediation Program), Dale Desoymers (DEC Director of Division of Environmental Remediation) and Timothy DeMeo (DEC Environmental Engineer with the Bureau of Spills Prevention and Response). Petitioner has separately moved to exclude these affidavits from consideration by the court. DEC opposes the motion.
The petition and the motion are consolidated for consideration and disposition in this decision.
I. The DEC Determination
The owner is in the process of constructing a luxury 80-room hotel and 100-seat restaurant at the property. In July 2004 it filed m application with the DEC to participate in the Brownfield Cleanup Program. On October 5, 2005 it received notification that its application had been denied. The denial concluded that the property did not meet che statutory definition of a “brownfield site.” The denial stated in relevant part:
“In determining whether the property constituting this application fits within the statutory definition of a brownfield, the Department reviewed your application package dated July 2004 and all supplementary materials, including the results of the supplemental investigations submitted in December 2004 and January 2005. The Department also reviewed the application materials in conjunction with the Department’s revised eligibility criteria published in March 2005. Among other things, the Department considered the past uses of the property, including use as a parking garage, a parking *419 lot, and as eight residential structures with some retail space. Furthermore, the Department considered that the design and finar cing for this project were approved by July 2003, prior to discovery of any contamination and prior to the passage of the brownfield statute in October 2003.
“In addition, the Department looked at the levels of contamination reported to the Department, which were, in the aggregate, relatively low; at the increase in development costs attributable to the environmental concerns in relation to the total cost of development and the value of the property; and the past uses which did not include processes which generate hazardous substances. Based on all these considerations, taken together with all the environmental data and all the statutory eligibility factors, set forth in the Brownfield Cleanup Program eligibility criteria, the Department has determined that the reuse or redevelopment of this property was not complicated by the presence or potential presence of contamination.”
The validity of this decision is now being challenged.
II. The Applicable Statutes
Effective October 7, 2003, the New York State Legislature passed the Brownfield Cleanup Program Act (BCPA). It is contained in sections 27-1401 to 27-1431 of the Environmental Conservation Law. Broadly speaking, the purpose of the legislation is to encourage the voluntary cleanup of hazardous waste sites and ultimate restoration of such sites to productive use, including restoration to the tax rolls. (Weinberg, Practice Commentaries, McKinney’s Cons Laws of NY, Book 17V2, ECL 27-1401 [2006 Pocket Part].) The statute provides substantial tax credits for the cleanup of real estate that is recognized as a “brownfield.” (Tax Law § 21.) It also provides for a release from future liability, if the cleanup is satisfactory. (ECL 27-1421.) The DEC is vested with the authority to implement a brownfield cleanup program, including the authority to make determinations about eligibility, approve remedial work plans and determine cleanup compliance. (See e.g. ECL 27-1407, 27-1409, 27-1411, 27-1419.)
The BCPA defines a “brownfield site” as “any real property, the redevelopment or reuse of which may be complicated by the *420 presence or potential presence of a contaminant.”[1] (ECL 27-1405 [2].) The internal mechanism of the BCPA requires that application first be made to the DEC to participate in the program. This triggers an investigation and a public notification process. (ECL 27-1407 [5].) DEC then makes its determination whether to accept or reject the application. The statute has an express list of reasons that mandate exclusion from the program. (ECL 27-1407 [8].) The statute also has a nonexclusive list of discretionary reasons to exclude an applicant from the program. (ECL 27-1407 [9].)
Accepted applicants are required to enter into a site cleanup agreement, acceptable to the DEC, which, among other things, requires that an owner remediate the property according to a plan that must include engaging community participation and comment. (ECL 27-1409, 27-1417.) The DEC is required to oversee and determine compliance while remediation is taking place and has the ultimate authority to certify whether the remediation is eligible for the attendant benefits. (ECL 27-1409 [5], [12]; 27-1419.)
There is no express mandate in the BCPA that the DEC issue guidelines or explanatory regulations. However, in May 2004 the DEC issued a “Draft Brownfield Cleanup Program Guide” that was published for public comment. In October 2004 the DEC issued a “Draft Brownfield Cleanup Eligibility Determination Guidance” that was also published for public comment. In March 2005 the DEC issued a final Eligibility Determination Guidance (Eligibility Guidance Manual). These publications were issued pursuant to the DEC’s authority under ECL 3-0301 (2) (z). There are conceded differences between the drafts and the final version of the DEC’s publication.
III. Petitioner’s Application
The owner first submitted its application to participate in the BCP on July 1, 2004, shortly after it acquired the property on June 29, 2004. A proposed remediation work plan was thereafter submitted on July 19, 2004. On July 27, 2004, the DEC considered the application complete, subject to certain additional requirements.
Certain events, however, preceded the owner’s actual application. By the time the owner acquired the property, its predecessor in interest (the prior owner) had already taken significant *421 steps toward the development of the hotel project.[2] The property had previously been used for many years as an unimproved parking lot.
In furtherance of the hotel project, the prior owner conducted a series of environmental assessments of the site.
In July 2003, Airtek, an environmental consultant hired by the prior owner, found that there were two 550 gallon underground unregistered storage tanks and that of three soil and groundwater samples taken, one soil sample had mercury and semivolatile organic compounds (SVOCs) in concentrations exceeding recommended soil cleanup objectives in the DEC’s Technical and Administrative Guidance Memorandum No. 4046 (TAGM). The samples were also significant for what Airtek did not find. There were no findings of volatile organic compounds (VOCs), no petroleum odors, no SVOCs or mercury in two of the three soil samples and none in the ground water samples.
Airtek reported the soil conditions to the DEC spill hotline. Nine months later, on April 14, 2004, petitioner submitted a work plan (spill work plan) to address the Airtek finding, which involved excavating contaminated soils in the “Area of Concern” until the soil analysis revealed no soil contaminated at the levels above the DEC recommended soil cleanup objectives. The area of concern was geographically limited to only the one particular site where contaminated soil was found and it was an extremely small part of the 10,080 square feet of land that was being developed as part of the hotel project. Moreover, the spill work plan was not a BCP work plan developed according to the criteria set forth in the BCPA, since the application for participation in the BCP had yet to be made by either the owner or its predecessor.
The DEC approved the spill work plan on April 29, 2004. The DEC did not consider the report to the spill hotline an emergency and, indeed, considered the report a “low priority” given the amount of contaminants reported. It approved the spill work plan without the need to even visit the property.
On June 29, 2004, the DEC issued a notice to proceed to the Manhattan Borough President and the New York City Department of Buildings in connection with the hotel project. The notice to proceed indicates that the DEC had no objection to the *422 issuance of permits for the hotel project to go forward with the understanding that no certificate of occupancy should be issued until the DEC had reviewed a closure report of the cleanup under the spill work plan and issued a notice of satisfaction. Petitioner claims that this notice prevented development of the site until all contaminants were removed from the soil.
It is unclear whether the owner or its predecessor remediated according to the spill work plan because the owner never sought any sign-off for completion from the DEC. Eventually the entire site was dug to a depth of 25 feet in order to permit the pouring of a foundation for the hotel project.
Airtek, at the behest of the owner, conducted a second subsurface investigation in July 2004 which included nine soil samples. It was this second investigation that resulted in the report and plan of remediation that were submitted as part of the owner’s BCP application. Laboratory analysis of the second set of samples revealed that the soil contained mercury and SVOC contamination in excess of applicable standards over “roughly” one half of the property and to a depth of 14 feet. Airtek recommended remediation work, which involved excavation of a substantial portion of the site, removal of the underground storage tanks, laboratory monitoring and community air monitoring. The remediation was undertaken by the owner without any form of DEC approval and over the DEC’S express admonishment that the owner was proceeding at its own risk.
Airtek eventually reported to the DEC that the remediation had been completed. Petitioner claims that the cost of this remediation was approximately $1,000,000. The DEC claims that a large part of this so-called remediation cost was excavation that was otherwise necessary for the owner to build a foundation for the hotel project.
While the owner’s application for participation in the BCP was pending, it continued to send additional, unsolicited material to the DEC. The owner also went forward with other aspects of the hotel project. On October 5, 2005, the application to participate in the BCP was denied.
IV Discussion
The standard for evaluating the DEC’s determination is whether it was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious. (CPLR 7803 [3].) In order for the court to find that an agency determi *423 nation is arbitrary and capricious, it would have to find that the action taken was without sound basis in reason and taken without regard to the facts. The question for the court is whether the agency determination has a rational basis. (Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222 [1974].) Where the issues concern the interpretation of a statute or regulation, the interpretations afforded by the agency responsible for its administration should be upheld, if they are not irrational or unreasonable. (Matter of Allstate Ins. Co. v Libow, 106 AD2d 110 [2d Dept 1984], affd 65 NY2d 807 [1985].)
The owner raises several arguments in support of its position. A primary argument is that the agency, in finding that the property was not sufficiently contaminated and/or that the financial impact of the remediation required did not complicate the hotel project, has interpreted the BCPA in a more restrictive manner than the enabling legislation allows. (Two Assoc. v Brown, 127 AD2d 173 [1st Dept 1987].) The court disagrees.
While the legislation is broadly drawn, it is clear from the actual language of the BCPA that all contaminated sites that are not expressly excluded are not necessarily intended to be included or accepted to the BCP. The statutory definition of “brownfield site” expressly conditions qualification upon the presence of contaminants that make the development of the site more “complicated.” The BCPA includes a nonexclusive, discretionary list of reasons to deny participation in the program (ECL 27-1407 [9]), clearly signifying that other reasons can justify the denial of an application by the DEC.
Given the broadly drawn statute, which contains words like “complicated” without precise and exact meaning, this court can look to the legislative history in order to determine whether the agency’s interpretation of the law is consistent with the legislative intent. (Giblin v Nassau County Med. Ctr., 61 NY2d 67 [1984]; Sanders v Winship, 57 NY2d 391, 396 [1982].) In this case, the DEC’S interpretation of the definition of the brownfield site is perfectly consistent with the legislative history. In enacting the BCPA, the Legislature rejected other versions of the bill which did not contain the qualifying requirement of complication, but would have allowed all contaminated sites to participate in the BCP. (See 2002 NY Senate Bill S 7686-A.) Clearly the version of the BCPA enacted requires analysis and determination of whether the limiting criteria in the statute are met.
*424 The DEC acted rationally in considering various factors in this case, including the hazard level of the contaminants, the issue of comparative cost, the steps already taken toward facilitating the underlying project (including financing and the extent of prior construction), in connection with its determination on the issue of complication. This is consistent with the overall objective of the BCPA, which is to restore brownfield sites to productive use. If the real estate in question is going to be restored to productive use, regardless of the presence of contaminants, then it is entirely rational for the agency to conclude that the “complication” statutory requirement has not been met. That is exactly what happened in this case.
The DEC’s determination that the reported contaminants at the site did not rise to the level of making it a brownfield site is also rationally supported. The DEC has particular expertise in these matters, which involve a mixture of both law and science. The DEC persuasively argues that a certain amount of contaminants are ubiquitous and that the mere existence of low levels of contaminants is not sufficient to trigger automatic acceptance into the BCE The owner’s reliance on the fact that the contaminants Airtek found exceeded TAGM levels for soil cleanup does not command a different result. As DEC points out, the TAGM levels are but one factor it looks at for guidance to determine whether remediation is necessary for any particular site.
The owner also raises several arguments about the March 2005 Eligibility Guidance Manual published by the DEC and its use in connection with DEC’s denial in this case. The owner argues that the Eligibility Guidance Manual: (1) contains regulations that were not adopted in accordance with New York state law; (2) is inconsistent with the BCPA, its enabling statute; (3) departs from prior agency practice; and (4) was improperly retroactively applied to the owner. As addressed seriatim below, these arguments all fail.
The owner claims that the Eligibility Guidance Manual contains agency “rules” that are required to be, but were not, adopted in accordance with the State Administrative Procedure Act. State Administrative Procedure Act § 102 (2) (b) (iv), however, expressly excludes from its purview “forms and instructions, interpretive statements and statements of general policy which in themselves have no legal effect but are merely explanatory.” The Eligibility Guidance Manual fits within this exclusion. It was published by the DEC to provide applicants *425 broad guidance on factors that the DEC would consider in connection with the issues of “contamination” and “complication” as part of the statutory definition of a brownfield site. The Eligibility Guidance Manual expressly indicates that such factors are only considered as they may be relevant to any particular case, thus supporting the DEC’s position that it makes a case-by-case factual analysis on all BCP applications submitted to it. (See Jopal Indus. v New York State Dept. of Envtl. Conservation, Sup Ct, Suffolk County, July 31, 2006, Emerson, J., and cases cited therein).
The owner has also failed to show that the Eligibility Guidance Manual was a departure from previous agency policy. The BCPA is a relatively new statute and one of the reasons for the publication of the Manual was the absence of any existing procedures or policies in place. The “prior policy” to which the owner refers was apparently followed in connection with a voluntary compliance program that was in effect before the BCPA was even adopted.
The owner claims that the criteria set out in the Eligibility Guidance Manual were improperly retroactively applied to it. At the time its BCP application was submitted to the DEC, the Eligibility Guidance Manual had not yet been published. The owner argues that when its application was completed, the prior DEC manual contained less restrictive requirements for entry into the BCE While there was a precursor informational document circulating at the time the owner claims its application was deemed complete by the DEC, it was clearly designated as a “draft.” In any event, the court does not believe that the factual criteria utilized by the DEC in determining the owner’s application, which is the same criteria set out in the Eligibility Guidance Manual, are inconsistent with or more restrictive than the enabling language in the BCPA. Thus the Eligibility Guidance Manual provides no basis to set aside the DEC determination in this case. In view of this conclusion, the court does not reach the issue raised by the DEC about the statute of limitations.
Finally, the DEC makes a significant point that the issues in this CPLR article 78 proceeding have been rendered moot by the owner’s actions in proceeding with remediation and otherwise advancing the hotel project before a final decision was made accepting it to the BCE The owner argues that the matter is not moot, because this court can find that it should have been accepted as an applicant and it is entitled to the *426 significant tax benefits available. The problem with the owner’s analysis is that acceptance into the BCP is but the first step in establishing entitlement to the tax benefits under the BCPA. The benefits are only available if, after acceptance, there has been a successful remediation according to an approved plan, with appropriate community input during the process, and ultimate DEC approval that the remediation has been successful. By moving forward with the remediation and the hotel project before being accepted into the BCP, these additional prerequisites for entitlement to the tax benefits can never be fulfilled. (Matter of Many v Village of Sharon Springs Bd. of Trustees, 234 AD2d 643 [3d Dept 1996].)
The owner’s contention that it was the DEC’s delay that caused this situation is a red herring. The owner had remedies for delay, including the right to bring a writ to compel an earlier determination. (CPLR art 78.) The court need not consider the DEC’s claim that part of the delay was due to the owner submitting additional unsolicited material. In deciding to go forward with remediation and other aspects of the hotel project without DEC approval, the owner either did or should have made its own cost/benefit analysis of the risks involved. The consequences of its own decision cannot be attributed to the DEC.
The owner has separately moved to strike the affidavits of Daniel C. Walsh, Dale Desoymers and Timothy DeMeo, submitted by the DEC in opposition to the petition. The owner argues that the affidavits are not part of the administrative record and should not be considered by the court. (See Matter of 72A Realty Assoc. v New York City Envtl. Control Bd., 275 AD2d 284 [1st Dept 2000].) This motion is denied.
The affidavits, based on personal knowledge, set forth some of the deliberative process and criteria that were considered by the DEC at the time it denied the owner’s brownfield application. This petition sounds in mandamus. In such a case the administrative record is not limited merely to the owner’s submissions before the agency and correspondence. An agency may consider whatever evidence is at hand, whether obtained in a hearing or otherwise. (Matter of Scherbyn v Wayne-Finger Lakes Bd. of Coop. Educ. Servs., 77 NY2d 753, 757 [1991].) Indeed the BCPA requires the DEC to investigate an application made to participate in the BCP, further indicating that the *427 administrative record need not be as restrictive as the owner argues.
The court notes, in any event, even without the additional affidavits, the decision by the DEC would withstand challenge.
V Conclusion
In accordance herewith it is hereby ordered that the relief requested in the petition is denied in its entirety and the clerk is directed to enter a judgment in favor of respondent and against the owner dismissing the petition, and it is further ordered that petitioner’s motion to strike affidavits from the record is denied, and it is further ordered that any relief requested that is not expressly granted herein is denied.

. This definition is subject to certain exceptions that are not relevant here.

. There is some indication that there may be common investors in both the current owner and the prior owner. Regardless, it is clear that when the current owner took title of the property it was with the purpose of pursuing the hotel project that had been previously undertaken by the prior owner.