OPINION OF THE COURT
Walter B. Tolub, J.
This CPLR article 78 application challenges respondent’s August 2, 2007 determination which denied petitioners’ application to participate in the Brownfield Cleanup Program under Environmental Conservation Law § 27-1401 et seq. Specifically, petitioners seek a declaration that (1) the site in issue is a “brownfield site” within the meaning of the Brownfield Cleanup Program Act, and (2) that the respondent’s decision was made in violation of lawful procedure, was affected by an error of law, was arbitrary and capricious and/or was an abuse of discretion. Petitioners additionally seek an order annulling and vacating respondent’s August 2007 decision and compelling respondent to accept their application to the Brownfield Cleanup Program. Lastly, petitioners seek an award of costs and disbursements associated with this proceeding.
At the core of this application is a 1.75 acre parcel of property located in the West Chelsea section of Manhattan. This property, known as the 76 Eleventh Avenue Development Site (the site or the property), is owned by petitioner HLP Properties, LLC, and is presently an at grade level parking lot which is exclusively used by the United States Drug Enforcement Administration. Petitioners seek to develop this parcel, which encompasses the entire block between West 17th Street and West 18th Street (south to north) and 10th Avenue and 11th Avenue (east to west), into two residential and commercial highrise towers.[1] The proposed developer of the site is petitioner West 17th Street Development, LLC. Petitioner Edison Mini Storage Corp. is the parent corporation of HLP and West 17th Street Development.[2]
*660 History of the Property
The property involved in this application has a unique history. Previously owned by nonparty Consolidated Edison (Con Edison), the site sits on a portion of land which was once occupied by the Manhattan Gas Light Company.[3] From roughly 1834 through the early part of the 1900s, this land, which spanned five modern city blocks,[4] parts of 11th Avenue/Route 9A, and parts of what is now Chelsea Piers, was home to the West 18th Street manufactured gas plant (West 18th Street MGP) (notice of petition, exhibit 20, West 18th Street Manufactured Gas Plant Site History Report at 2-1, 3-1 — 3-4). During the height of the Gaslight Era, the West 18th Street MGP converted coal into a combustible gas which was then supplied to all of Manhattan north of Canal Street (notice of petition, exhibit 20, West 18th Street Manufactured Gas Plant Site History Report; mem of law in opposition to petitioners’ application at 16-18). When the manufactured gas plants ceased operations shortly after the turn of the twentieth century, the land was subdivided into 13 parcels and ultimately redeveloped.
Petitioners’ property site was the location of the main gas production facilities for the West 18th Street MGP Sitting squarely on block 689, the site was the first property purchased for the MGP in the mid-1830s, and, once raised above water level, quickly became home to a retort house, condensers, washers and a purifying house (notice of petition, exhibit 20, West 18th Street Manufactured Gas Plant Site History Report at 5-2 — 5-4). By 1859, the site also included a large coal house and a lime house complex (id. at 5-2 — 5-9). In 1917, after the cessation of gas production, the property was sold to the New York State Realty and Terminal Company. From 1932 through 1960, the property was owned by the New York Central Railroad Company (id. at 5-8, 5-13). Since 1960, the site has been privately owned by various realty companies and corporations (id.).
*661 It is undisputed by the parties that the more than 60 years of unabated gas production deposited significant quantities of environmental contaminants into the surrounding land. The primary by-product of MGP gas production,[5] and, in fact the primary site contaminant, is coal tar, a complex mixture of organic chemicals, some of which have been identified as being extremely hazardous. Multiple studies conducted on the site between 1994 and 2002[6] have additionally revealed the presence of volatile organic compounds, semi-volatile organic compounds and heavy metals.[7]
Statutory Background
Successful analysis of this application requires this court to review the history of the various types of legislation enacted in this country, and more particularly, this State, addressing the cleanup of environmentally contaminated land.
A legacy of environmental contamination by past industrial and commercial operations in the United States prompted Congress in 1980 to enact the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 USC § 9601 et seq.). CERCLA, more commonly known as Superfund, provided among other things, broad federal and state authority to respond directly to releases or threatened releases of hazardous substances that could potentially endanger public health or the environment (id.). New York, acting on the heels of its then most notorious environmental disaster, the Love Canal site in Niagara Falls, contemporaneously established a comparable program of its own — the Inactive Hazardous *662 Waste Disposal Sites Program under Environmental Conservation Law § 27-1301 et seq. (the State Superfund).
Although both programs offered ways to remediate contaminated properties, there were limitations. Superfund was not an all-inclusive reimbursement fund, and limited reimbursement to cleanup costs incurred and damage to natural resources owned either by states or the federal government (42 USC § 9601 et seq.; see also Philip Weinberg, Practice Commentaries, McKinney’s Cons Laws of NY, Book 17½, ECL 27-1301 [2007]). The State Superfund was even more limited in the sense that the definition of hazardous waste was narrower. The result was a combination of both confusion with respect to applicable law, accompanied by an unwillingness to develop less contaminated properties for fear of liability which could have attached under either statute. These less contaminated properties, known as “brownfields,” created an additional problem: they unwittingly promoted urban sprawl in areas which, more often than not, lacked the infrastructure to sustain such development (respondent’s mem of law in opposition at 6-7; see also Vogel, An Examination of Two of New York State’s Brownfields Remediation Initiatives: Title V of the 1996 Bond Act and the Voluntary Remediation Program, 17 Pace Envtl L Rev 83 [Winter 1999]).
To address this problem, in late 1994, the Department of Environmental Conservation (DEC) initiated an administratively created voluntary cleanup program (VCP) designed to allow parties to investigate and clean up abandoned contaminated sites and return those sites to productive use (affidavit of Dale A. Desnoyers 1i 3). Completely overseen by the DEC, the volunteers, in exchange for remediating the toxic sites, received protection against future liability arising out of the redevelopment of those properties. Numerous voluntary cleanup agreements (VGA) under the VCP were issued, including one for the petitioners’ site. This VGA, which is of some importance to this application, will be discussed infra.
Enactment of the Brownfield Cleanup Program Act
In 2003, the New York State Legislature enacted the Brownfield Cleanup Program Act (BCPA). Contained within ECL 27-1401 through 27-1431, the legislation was designed to encourage the voluntary cleanup of hazardous waste sites, and the restoration of those sites to productive use and, in many instances, the tax roll (ECL 27-1401 et seq.; 377 Greenwich LLC v New York State Dept. of Envtl. Conservation, 14 Misc 3d 417, *663 419 [Sup Ct, NY County 2006], citing Philip Weinberg, Practice Commentaries, McKinney’s Cons Laws of NY, Book 17½, ECL 27-1401 [2004]). Applicants accepted into the Brownfield Cleanup Program (BCP) who successfully complete the remediation requirements for their respective property site(s) obtain a certificate of completion. The certificate of completion not only provides additional liability limitations under the statute (see ECL 27-1421 [1]), but also enables applicants to benefit from three significant tax credits: the brownfield redevelopment credit;[8] the brownfield credit for real property taxes;[9] and the environmental remediation insurance tax credit[10] (see Tax Law §§ 21-23). Receipt of these rather lucrative tax credits, of course, hinges on whether a property is deemed eligible under the BCPA.
Because the 2003 enactment of the BCPA codified many of the existing provisions created by DEC’S 1994 voluntary cleanup program, the DEC administratively created three options for those properties already subject to a VCP agreement. These administrative options allowed a party subject to an existing VCP agreement to either transfer into the BCP by the June 1, 2004 DEC-imposed deadline (see affidavit of Dale A. Desnoyers If If 11-12; respondent’s record at 256); terminate their existing VCP agreement and apply for BCPA benefits (subject to the approval process as set forth under the statute); or, continue to operate under their respective VCP agreement(s).
*664 History of the Instant Application
Petitioners’ site is the subject of one such VCP agreement that was applied for, and received, by nonparty Con Edison in 2002 (the 2002 VCP agreement). Under the terms of the 2002 VCP agreement, Con Edison, at its own expense, was to investigate and remediate petitioners’ site along with 44 other contaminated sites located throughout the state.[11] Con Edison, for whatever reason,[12] did not move to transfer the 2002 VCP agreement into the BCP in 2004.
Notwithstanding the 2002 VCP agreement, in 2004, HLP submitted its own BCP application for the site. By letter dated April 18, 2005, Con Edison objected to HLP’s application, arguing that the property did not and could not qualify as a BCP site while the Con Edison 2002 VCP agreement for the same property remained in effect (respondent’s record at 581).[13] The, same letter indicated that Con Edison had no intention of terminating the existing VCP agreement (id. at 582).[14] This sentiment was reiterated by Con Edison in a second letter dated August 19, 2004 (id. at 609).
It appears from the record that after this exchange, Con Edison and HLP attempted to reach an agreement addressing the needs of both parties with respect to remediating the site’s environmental contaminants. These attempts however were unsuccessful. The 2004 application submitted by HLP was not acted upon by DEC and was ultimately withdrawn on December 22, 2006.
The January 2007 BCP Applications
In January of 2007, both nonparty Con Edison and petitioner HLP submitted concurrent, but separate, BCP applications for *665 the site. Con Edison’s application sought transfer of the remedial obligations it had to the site under its 2002 VCP agreement into the BCP (respondent’s record at 26). Petitioner HLP’s application sought admission into the BCP under the statutory criteria for the redevelopment of the property (id. at 5). Neither party voiced objection to the other’s concurrent application. By letter dated August 2, 2007, both BCP applications were denied. DEC’s denial, in pertinent part, reads as follows:
“In making this determination, the Department concluded that there is not a reasonable basis to believe that the redevelopment or reuse of the Parcel may be complicated by the presence of contamination . . .
“The Parcel is one of 45 historic MGP Plants and manufactured gas storage holder station locations covered by an August 2002 Voluntary Cleanup Agreement between Con Edison and the Department. The West 18th Street Gas Plant is designated as Site V00530. In accordance with the VGA [the VCP Agreement],[15] Con Edison has committed to investigate and implement whatever remediation the Department determines is necessary to protect human health and the environment.
“In evaluating whether the redevelopment of the Parcel is being complicated by the presence of contamination on the property, the Department evaluated the following factors:
“Is the parcel idled, abandoned, or underutilized?
“Do properties in the immediate vicinity of the Parcel show indications of economic distress such as high commercial vacancy rates or depressed property values?
“Is the redevelopment or reuse of the Parcel complicated by the presence or potential presence of contamination?
“The Department has determined that the Parcel is neither unattractive for redevelopment or reuse due to the presence of contamination, nor is it idled, abandoned, or underutilized.
*666 “The history of the Parcel described above shows nearly continuous use since the days of the MGP facility. Even today, the Parcel is used as an at-grade paved parking facility. Clearly the Parcel has not been, and is not currently, idle or abandoned although, given the recent rezoning, it could be put to more productive uses.
“In considering whether properties in the immediate vicinity of the proposed site show indicators of economic distress . . . such conditions do not exist in the vicinity of the Parcel. Other properties in the immediate area are being aggressively developed and property values have increased significantly since the City’s rezoning in June 2005.
“In determining whether redevelopment or reuse of the Parcel may be complicated by the presence or potential presence of contamination, Con Edison has, in the past, indicated that it had no intention of terminating the VGA which it had entered into for the purpose of addressing the [sic] resolving its liability for the environmental consequences of past MGP operations. The VGA addresses any [s¿c] MGP-related contamination.
“The Department’s determination that the Parcel is not a brownfield Site as defined in the ECL is consistent with a recent decision where the court held that if the real estate in question is going to be restored to productive use, then it is entirely rational for the Department to conclude that the ‘complication’ statutory requirement has not been met 377 Greenwich LLC v. New York State Dept. Of Environmental Conservation, 14 Misc 3d 417 (Sup. Ct. New York County 2006). Given the redevelopment along the High Line, the June 2005 rezoning by the City of New York, and Con Edison’s remediation of the property pursuant to the VGA, the Department concludes that the Parcel is not a ‘brownfield site’ given that there is not a reasonable basis to believe that the Parcel is unattractive for redevelopment or reuse, or that such redevelopment or reuse may be complicated by the presence of contamination.” (Petitioners’ exhibit 1.)
*667 This application challenging the DEC’S decision followed.[16]
Discussion
Judicial review of agency determinations traditionally limits the court’s scope of analysis to whether the challenged determination was rationally based, or whether it was made in violation of lawful procedure, was affected by an error of law, was arbitrary and capricious or an abuse of discretion (CPLR 7803; Matter of Pell v Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County, 34 NY2d 222, 231 [1974]; Chinese Staff & Workers Assn. v City of New York, 68 NY2d 359, 363 [1986]; Flacke v Onondaga Landfill Sys., 69 NY2d 355 [1987]; see generally 2 Barr, Altman, Lipshie, and Gerstman, New York Civil Practice Before Trial §§ 42:200-42:244 [James Publ 2007]). It is not a de novo review (see Greystone Mgt. Corp. v Conciliation & Appeals Bd. of City of N.Y., 94 AD2d 614, 616 [1st Dept 1983], affd 62 NY2d 763 [1984]), and will not result in this court substituting its judgment for that of the agency responsible for making the determination in this application (see Matter of Purdy v Kreisberg, 47 NY2d 354 [1979]).
When however, the focus of the challenged determination turns on the language of the statute itself, the court’s primary objective becomes the legal interpretation of the statute (Matter of Moran Towing & Transp. Co. v New York State Tax Commn., 72 NY2d 166, 173 [1988]), thereby requiring consideration of both the purpose of the enacted legislation and its objectives (People v Ryan, 274 NY 149, 152 [1937]). The legislative intent becomes the controlling interest in the analysis, and the reliance placed upon the special competence or expertise of the administrative agency charged with the statute’s enforcement and promulgation of interpretive regulations is dramatically reduced (see Matter of KSLM-Columbus Apts., Inc. v New York State Div. of Hous. & Community Renewal, 5 NY3d 303, 312 [2005]; Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 459 [1980]). Agency determinations running counter to the clear wording of a statutory provision are afforded little weight (Matter of Raritan Dev. Corp. v Silva, 91 NY2d 98, 103 [1997]), and those which completely conflict with the clear wording of a statutory provision are not to be upheld (id.; Kurcsics, 49 NY2d 451, 459 [1980]).
*668 Petitioners challenge respondent’s denial of their application bn the grounds that the DEC’s decision was not made based on a demonstrated ineligibility under the statute, but rather, an ineligibility based on respondent’s interpretation of the statute.[17] Respondent, in opposition, contends that its determination, which admittedly utilized agency-created guidance documents in determining petitioners’ ineligibility, was not unreasonable. This court disagrees.
The legislative intent behind the enactment of the Brownfield Cleanup Program Act is by no means ambiguous. The statute was expressly created to encourage the voluntary remediation of brownfield sites for reuse and redevelopment, and to clean up the thousands of “abandoned and likely contaminated properties” which threatened the health of the people of the State of New York (ECL 27-1403). With this intent in mind, ECL 27-1405 (2), which has not changed since petitioners filed their BCP application,[18] was crafted to simply define a brownfield site as being “any real property, the development or reuse of which may be complicated by the presence or potential presence of a contaminant.”
Respondent argues that usage of the word “any” in ECL 27-1405 (2) means that the definition is not all-encompassing and is not to be extended to all properties. It further argues that use, of the phrase, “may be complicated by a contaminant,” coupled with ECL 3-0301 (2) (z)[19] and the decision issued in 377 Greenwich LLC v New York State Dept. of Envtl. Conservation (14 Misc 3d 417 [Sup Ct, NY County 2006]), allows the DEC to determine BCP eligibility first by using administratively created economic guidance factors, and then by using similarly created factors to determine whether or not the reuse or redevelopment of the property “may be complicated” by the existence or potential existence of contaminants.
*669 There are many problems, however, with this interpretation. As a preliminary matter, the word “any” when contained within a statute has been deemed “as inclusive as any other word in the English language” and does not, as respondents argue, create an ambiguity (New Amsterdam Cas. Co. v Stecker, 3 NY2d 1, 6 [1957]). Interpretations to the contrary would decry multiple decisions issued by the Court of Appeals which have consistently held that statutes should be interpreted so as to effectuate the intent of the Legislature, construing clear and unambiguous statutory language “so as to give effect to the plain meaning of the words used” (Patrolmen’s Benevolent Assn. of City of N.Y. v City of New York, 41 NY2d 205, 208 [1976]; Doctors Council v New York City Employees’ Retirement Sys., 71 NY2d 669, 674-675 [1988]; Raritan Dev. Corp., 91 NY2d 98, 106-107 [1997]).
More problematic however, is that while the implementation of a statute may place an agency in a position where they are forced to deal with competing interests, striking a balance between those interests is exclusively a legislative function (Boreali v Axelrod, 71 NY2d 1 [1987]). Stated differently, an agency, by law, is not allowed to “legislate” by adding “guidance requirements” not expressly authorized by statute (see Matter of Medical Socy. of State of N.Y. v Serio, 100 NY2d 854 [2003]; Boreali v Axelrod, 71 NY2d 1 [1987]; Destiny USA Dev., LLC v New York State Dept. of Envtl. Conservation, 19 Misc 3d 1144[A], 2008 NY Slip Op 51161[U] [Sup Ct, Onondaga County 2008]).
The DEC, in using its own administratively-created and far more limiting guidelines to determine petitioners’ ineligibility, engaged in this proscribed activity. Although undoubtedly created with good intentions, the four “guidance factors”[20] applied are not only unsupported by the express language of the stat *670 ute,[21] they have come under direct assault from multiple entities in this state, including the New York State Bar Association Environmental Law Section, since their introduction in 2004 (see Destiny USA Dev., 2008 NY Slip Op 51161[U], *16-17). As noted by Justice Cherundolo in Destiny USA Dev.:
“The draft cleanup program ‘guidance’ came under significant assault from urban planners, developers and environmental lawyers throughout the state. The New York State Bar Association Environmental Law Section severely criticized the guidance as being thoroughly arbitrary, capricious, and unduly and illegally limiting of the clear intention of the statute. These comments, dated November 19, 2004, start by saying: . . .
“ [1] the proposed new restrictions on site eligibility do not have a clear basis in the statute itself. . .’
“Many of the concerns raised by the New York State Bar in those comments reverberate through the decisions in this case by the Department of Environmental Conservation (see e.g. comment 6.4, 6.5, 6.6, 6.9 and others). The comments criticize DEC for taking on the role [of] official watchdog (comment No. 7), and effectively legislation [sic] ‘statutory’ criteria that defines the overall fiscal effect of implementing the statute. Petitioner asserts (as did the New York State Bar Environmental Law Section) that only the legislature has authority to contend with the fiscal ramification of a statute, and it does, when passing legislation” (id. at *11-12).
Perhaps most tellingly, to date, not only has the Legislature declined to adopt the DEC’s “guidance factors” in the ECL, the guidance factors are conspicuously missing from the DEC’s own regulations with regard to the BCPA (see 6 NYCRR part 375).
This court is also not in agreement with the result reached in 377 Greenwich. Although the court agrees that use of “eligibil *671 ity guidance factors” to implement the BCPA is not inconsistent with the statutory scheme (see 14 Misc 3d 417 [2006]), it disagrees with the conclusion that the DEC acted rationally in adopting and imposing economic regulations not contained within the statute. To conclude otherwise defeats the legislative intent of the statute (see Boreali, 71 NY2d 1, 9 [1987]). The DEC’s use of “guidance factors” as set forth in the August 2, 2007 letter denying petitioners’ BCP application is erroneous in that it constitutes an impermissible attempt to legislate, and is inconsistent with the Legislature’s intent to encourage remediation. The denial of petitioners’ BCP application must therefore be, and is hereby, reversed, and respondent is directed to accept petitioners’ property into the BCP as it existed under the 2007 version of the statute.
As a final note, the court acknowledges that although not expressly stated, this application also raised the unique question as to whether a property owner is entitled to reap the benefits associated with the Brownfield Cleanup Program where a third party has already voluntarily agreed to undertake all responsibility for the investigation and removal of environmental toxins from the affected parcel. Having reviewed the statute, this court concludes that the existence of the Con Edison 2002 VCP agreement for the subject site does not impede petitioners’ application for, and inclusion in, the BCE However, this is not to suggest that petitioners would be entitled to a “windfall” of economic tax breaks. The tax credits, by statute, are inextricably linked to the amount expended by the parties responsible for the actual cleanup of the property. As such, it is expected that any credits petitioners may be entitled to in the future would be based upon their share of the actual remediation of the property site.
Petitioners’ requests for an award of costs and disbursements associated with this proceeding is denied as they are unsupported by a statutory basis.
As such, it is adjudged and declared that the August 2, 2007 decision rendered by respondent, the New York State Department of Environmental Conservation, which denied petitioners’ application for inclusion in the Brownfield Cleanup Program under Environmental Conservation Law § 27-1401 et seq., was arbitrary and capricious and/or was an abuse of discretion; and it is further adjudged and declared that the aforementioned decision is vacated; and it is further adjudged and declared that petitioners’ property is deemed to *672 be a “brownfield site” within the meaning of the Brownfield Cleanup Program Act; and it is further ordered that the petitioners’ property site be accepted into the Brownfield Cleanup Program.

. The site is in close proximity to the High Line, a former railroad viaduct that is presently under consideration for inclusion on the National and State Registers of Historic Places. In 2005, much of the area surrounding the High Line, including petitioners’ parcel, was rezoned by the City of New York to allow for the development of larger residential and commercial projects.

. For clarity in this decision, unless one of the individual petitioners is being directly addressed, the term “petitioners” collectively refers to HLR West 17th Street Development, and Edison Mini Storage.

. The Manhattan Gas Light Company is a predecessor-in-interest to nonparty Con Edison.

. The five modern city blocks are now known as blocks 688, 689, 690, 691, and 715. For perspective, block 688 is the entire block bounded by West 16th Street, West 17th Street, 10th Avenue and 11th Avenue/Route 9A. Block 689 is the petitioners’ site. Block 690 is the entire block bounded by West 18th Street, West 19th Street, 10th Avenue and 11th Avenue/Route 9A. Block 691, tax lots 1 and 11 is the western end of the block bounded by West 19th Street, West 20th Street, 10th Avenue and 11th Avenue/Route 9A, and block 715, tax lot 59 is the northwestern area of the block bounded by West 17th Street, West 18th Street, 9th Avenue and 10th Avenue.

. Other by-products of eoal-to-gas production include ammonia, purifier wastes, light oils, creosote oils, anthracene, benzol, solvent naphtha and carbolic acid (see notice of petition, exhibit 20, West 18th Street Manufactured Gas Plant Site History Report at 6-1, 6-4).

. Studies were produced in 1994 by AKARF, Inc., as part of the Route 9A reconstruction project. Studies were undertaken by MTA as part of an environmental site investigation in 1998 and 1999. Contamination is further discussed in the Site Characterization Study Report for the former West 18th Street gas works in 2006 (see notice of petition, exhibit 20, West 18th Street Manufactured Gas Plant Site History Report at 7-4; exhibit 31).

. The contaminants found on petitioners’ site, many of which are present at levels exceeding those deemed “safe” by state standards, include: petroleum, total petroleum hydrocarbons, polycyclic aromatic hydrocarbons, poly-chlorinated byphenyls, benzene, toluene, ethylbenzene, napthalene, sulfides, solvents, ammonia, acetone, m/p xylenes, o-xylene, and isopropylbenzine. Toxic inorganics found during testing, also excessive in acceptable levels, include: arsenic, cadmium, copper, lead, mercury, nickel, zinc, cyanide and amenable cyanide.

. In its simplest form, the brownfield redevelopment credit is composed of three elements: site preparation costs (expenses related to cleaning and preparing the site for development); tangible property costs (includes buildings and structural components); and expenses related to on-site remediation of groundwater costs (Tax Law § 21 [a] [2]-[4]). The calculation also takes into consideration whether the property sits within an environmental zone (EN-Zone) as designated by the Commissioner of Economic Development. An EN-Zone must have both a poverty rate of at least 20% and an unemployment rate of at least 174 times the statewide unemployment rate for the year to which the data relate (Tax Law § 21 [b] [6]).

. The brownfield credit for real property taxes (Tax Law § 22) is available for 10 consecutive tax years following the issuance of the certificate of completion and is a product of the taxpayer’s “employment factor” (calculated as a percentage of the number of persons employed on the site) and the taxpayer’s eligible real property taxes with a multiplier, and a maximum credit that is affected based on whether the site is or is not in an EN-Zone (id.; see also affidavit of Dale A. Desnoyers H 24).

. The environmental remediation insurance tax credit (Tax Law § 23) is a one-time credit with a maximum value of $30,000 available in the year that the certificate of completion is issued and represents a percentage of premiums for environmental insurance on the property (id.; see also affidavit of Dale A. Desnoyers 1Í 24).

. Review of the record reveals that Con Edison’s VCP application was not the first one made for the site. In 1999, a VCP application for the subject site was submitted to DEC by HLP’s predecessor, 76th Eleventh Avenue Development LLC (see respondent’s record at 815). That application appears to have been abandoned in 2001.

. While not expressly stated, the court suspects economics played a role in Con Edison’s decision to not transfer the 2002 VCP agreement during the DEC’s VCA-BCP transition period.

. The court notes that the applicable statutory provisions do not contain any limiting language supporting this claim.

. The April 2005 letter also eludes to the existence of an April 2004 access agreement entered into as between Con Edison and petitioner Edison Mini Storage to effectuate the cleanup of the site independent of the 2002 VCP agreement (id. at 582-590). This letter was not included by any of the parties, and was not submitted by nonparty Con Edison.

. For clarity, although this decision refers to the voluntary cleanup agreements as VCP agreements, the DEC’s August 2, 2007 letter identifies these agreements as “the VGA.”

. Con Edison did not challenge the August 2007 application denial. It continues to carry out its obligations as set forth under the 2002 VCP agreement.

. To reiterate, respondent’s denial is premised on four primary points: (1) the parcel did not meet the definition of a “brownfield site” as set forth under the statute; (2) there was no basis to believe that the redevelopment or reuse of the property in issue “may” be complicated by the presence of contamination; (3) the parcel had not been and was not currently idle or abandoned; and (4) the property was not situated in an “economically distressed” area.

. Although the court acknowledges that amendments to the BCPA have been effectuated since the denial of petitioners’ BCP application, for the purposes of this decision, this court need only consider the statute as it existed in 2007 — the year in which petitioners’ application was initially made.

. ECL 3-0301 (2) (z) gives the DEC the authority to create “guidance documents” to assist in the implementation of the ECL.

. These guidance factors used by the DEC are as follows:
“(A) whether the proposed site is idled, abandoned, or underutilized;
“(B) whether the proposed site is unattractive for redevelopment or reuse due to the presence or reasonable perception of contamination;
“(C) whether the properties in the immediate vicinity of the proposed site show indicators of economic distress such as high commercial vacancy rates or depressed property values; and/or
“(D) whether the estimated cost of any necessary remedial program is likely to be significant in comparison to the anticipated value of the proposed site as redeveloped or reused” (BCP Guidance Manual § 2.2 [3]; mem of law in opposition to petition at 31).

. Respondent’s contention that their “guidance factors” are required to determine eligibility is supported by ECL 27-1407 (1) and 27-1415 (3) (a) (i) and (3) (i) (i) is misplaced. ECL 27-1407 (1) contains provisions detailing the requirement to submit a request to the DEC containing sufficient information so as “to allow the department to determine eligibility and the current, intended and reasonably anticipated future land use of the site.” ECL 27-1415 (3) (a) (i) and (3) (i) (i) are directed at the remedial programs for a site, not whether the site is initially eligible.