OPINION OF THE COURT
Lewis Bart Stone, J.
This proceeding was commenced by notice of petition dated December 21, 2007, by petitioner, East River Realty Company, LLC, the owner of four parcels of land located between East 36th Street and East 41st Street on both sides of First Avenue in Manhattan, to review a determination of the New York State Department of Environmental Conservation (DEC) rendered on October 9, 2007 (the determination), which denied East River’s application to include such parcels in the New York State Brownfield Cleanup Program (BCP).
At the initial oral argument on June 17, 2008, the court directed the parties to submit supplemental briefings on the meaning of certain terms used in Environmental Conservation Law § 27-1405 (2), specifically three issues, viz., the definition of “brownfield site,” the impact of Destiny USA Dev., LLC v New York State Dept, of Envtl. Conservation (19 Misc 3d 1144[A], 2008 NY Slip Op 51161[U] [Sup Ct, Onondaga County 2008]), a decision considering many of the issues here which was decided several days before the initial oral argument, and the impact of recent amendments to the BCP made by Laws of 2008 (ch 390) (the 2008 amendments) which became law on July 21, 2008. Because the latter two matters occurred after the initial written submissions were made, neither was addressed in the parties’ initial submissions.
Both parties submitted briefs on such matters and a supplemental oral argument was heard on August 22, 2008, the matter being fully submitted at that time.
The State Brownfield Cleanup Program
New York enacted the BCP by Laws of 2003 (ch 1, part A, § 1) as ECL article 27, title 14 (ECL 27-1401 — 27-1435). Its purpose is set forth at length in ECL 27-1403, the relevant part of which reads:
“The legislature hereby finds that there are thou *406 sands of abandoned and likely contaminated properties that threaten the health and vitality of the communities they burden, and that these sites, known as brownfields, are also contributing to sprawl development and loss of open space. It is therefore declared that, to advance the policy of the state of New York to conserve, improve, and protect its natural resources and environment and control water, land, and air pollution in order to enhance the health, safety, and welfare of the people of the state and their overall economic and social well being, it is appropriate to adopt this act to encourage persons to voluntarily remediate brownfield sites for reuse and redevelopment by establishing within the department a statutory program to encourage cleanup and redevelopment of brownfield sites.”
ECL 27-1405 (2) defines a “brownfield site” for the purposes of the BCP as: “any real property, the redevelopment or reuse of which may be complicated by the presence or potential presence of a contaminant.”
Although sites involving ongoing environmental enforcement proceedings and Superfund sites were excluded from this definition, the parties agree that such exclusions do not apply to the East River sites.
Under ECL 27-1407, to participate in the BCB an applicant must apply to the DEC, which determines whether the site and proposed remediation qualifies under the standards for participation set forth in the aforementioned ECL section. The owner of a qualified site must thereafter enter into a brownfield site cleanup agreement (a cleanup agreement) and become subject to DEC oversight to assure compliance. The benefits for successful participants include limitations on certain future environmental liabilities and tax credits for certain remediation and development costs.
The BCP imposed no limit on the number of eligible sites and no limit on the amount of tax credit benefits available for any site or as an aggregate in any period. Those tax benefits applied both to cleanups and development costs.[1]
Before the BCP was enacted, DEC had established by regulation an earlier voluntary program to address brownfield issues, known as the Voluntaiy Cleanup Program (VCP). The purpose of *407 the BCP was to increase the inducements to owners over those available under the VCP in order to expedite the return of brownfields to productive uses. Recognizing the new approach, DEC, following the enactment of the BCP announced in January 2004 that it would no longer accept applications for the VCP and encouraged VCP participants to switch to the BCP
As the BCP includes “any property” which meets the criteria for the BCP, it was enacted as an entitlement program, i.e., if one qualified, one received the benefits.
Facts
The four sites (collectively, the sites) at issue here are:
1. 708 First Avenue, (the 708 site) located approximately between East 40th and East 41st Streets and between First Avenue and Franklin Delano Roosevelt Drive (FDR Drive) in Manhattan.
2. 700 First Avenue (the 700 site) located approximately between East 38th and East 40th Streets and between First Avenue and FDR Drive in Manhattan.
3. 685 First Avenue (the 685 site), located between East 39th and East 40th Streets, west of First Avenue in Manhattan.
4. 616 First Avenue (the 616 site), located between East 35th and East 36th Streets and between First Avenue and FDR Drive in Manhattan.
The sites had been used for industrial purposes for many years. For example, a coal gasification facility was formerly located on the 708 site, the former Waterside electric generating facility was located on the 700 site, and the former Kips Bay Fuel Terminal was located on the 616 site. Industrial operations on these sites had led to the presence of substantial contaminants. The sites are now being developed for multi-use residential developments.
In June 2001, East River entered the VCP program with respect to all four sites. In March 2004, following the enactment of the BCP East River, believing its sites to qualify thereunder, applied to DEC to transfer such sites to the BCE
On June 30, 2004, DEC advised East River that its application to include the four sites in the BCP was complete. The public comment period expired on August 6, 2004, and the “best efforts” deadline for DEC to accept or reject the applications was passed on August 15, 2004.
Subsequently, on April 14, 2005, DEC delivered a final cleanup agreement for the sites to East River, and, on November 17, *408 DEC reconfirmed to East River that the four sites were eligible for the BCE On December 13, 2006, East River executed the cleanup agreement and delivered it into escrow and so advised DEC. The cleanup agreement was put into escrow because of pending litigation not relevant to this proceeding. Following the termination of such litigation on April 23, 2007, the escrow agent, as instructed under the terms of the escrow, delivered the executed cleanup agreement to DEC. DEC did not execute the cleanup agreement and almost six months later, on October 9, 2007, issued the determination which denied the sites’ inclusion in the BCE This proceeding was thereafter commenced on December 21, 2007, or well within the four-month period for commencing a proceeding under CPLR article 78 to challenge the determination.
During the pendency of this proceeding, East River withdrew its objection to DEC’s exclusion of the 685 site from the BCE Accordingly, this proceeding now and this decision and order relates only to that part of the determination which excluded the 616, 700 and 708 sites from the BCE
DEC’s principal defense to the petition is that DEC has construed the statutory eligibility criteria of “complicated” to include a “but for” test, i.e., that DEC could consider whether remediation would have occurred without the benefits of the BCR and for such reason exclude such site from the BCE DEC’s position is that it applied such standard in rendering the determination. East River contends that the statute neither includes nor allows a “but for” test to be imposed and that any site where its redevelopment or reuse is “complicated” by the presence of contaminants, and which is not excluded by other limitations here not relevant, is entitled to participate in the BCE as of right.
At oral argument the parties concurred that the issue before this court is whether DEC’s imposition of a “but for” test to determine the eligibility of a site for inclusion in the BCE was arbitrary and capricious and in violation of law or whether it was not.
Whether the statute imposes such a test or whether DEC may impose such a test under the authority of the statute is an issue of statutory construction. While it is clear from a review of the statutory scheme for the BCE that the BCE was designed to be an “entitlement” like program — that is, one where if a party qualified, it received benefits, if it did not, it received none — the parties do not agree on how the eligibility criteria are to be construed.
*409 McKinney’s Consolidated Laws of NY, Book 1, Statutes, provides a guide for the construction and interpretation of New York statutes. While Statutes does not constitute “law” in that Statutes was not enacted into law by the Legislature[2] and is thus not expressly binding on this court, Statutes is, however, commonly cited and generally followed by NewYork courts.[3] This court will similarly follow Statutes as a guide to the resolution of the issues here. In addition to construing ECL article 27, title 14, per se, this court must also address issues of administrative law as DEC, the agency primarily responsible for the administration of the BCE] is not only a party to this proceeding, but has also itself construed the very provision in controversy here.
This court will also consider precedents relevant to the issue, including those that directly relate to the very question before the court, as well as those that are analogous. The court must also consider whether such precedents are binding or are to be given “respectful consideration” {see McKinney’s Cons Laws of NY, Book 1, Statutes § 72 [b], Comment at 143-144) and, in the latter case, to accord such respectful consideration to such unbinding precedent.
Finally, this court will also consider the legislative history of the BCP and how that may affect its construction.
I. The Text of the BCP
Any analysis of the meaning of a statute must begin (but need not end) with the text of the statute itself. Here, three aspects of the text of ECL article 27, title 14, as enacted in 2003, are relevant. First, title 14 itself contains no language expressly enacting a “but for” test for eligibility. Second, title 14 contains a definition of brownfield in an uncommon definitional locution under New York law. Third, title 14 authorizes DEC to administer the BCE
As there is no explicit “but for” test in title 14, authority for the determination which imposed a “but for” test may only derive from either the definition of “brownfield site,” the DEC’s authorization to administer the BCP or from some principle of *410 statutory construction that requires or allows the court to look past the text of the statute itself. This court will address all three possibilities.
A. Definition of “Brownfield Site”
The BCP definition of brownfield site set forth in ECL 27-1405 (2) is any real property where “the redevelopment or reuse of which may be complicated” by contaminants. Under the statutory scheme, where a site qualifies under this definition, an entitlement to benefits arises once proper procedural steps are taken under the statute. The term “may be complicated” is an unusual locution in New York law.[4] While in the absence of context, it may be possible to argue that “but for” is a component of “complicated,” the source of the “may be complicated” language negates any such construction.
The Bill Jacket for Laws of 2003 (ch 1) is silent on the origin of the term “complicated” in this context. However, from the history surrounding the adoption of the BCE it is clear that the term was adopted from federal environmental law. The Federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) (42 USC § 9601 et seq.), the principal federal environmental statute in force in 2003, uses the same term in its definition of a “brownfield.” Such federal definition of brownfield, now in 42 USC § 9601 (39) (A), was added by the 2002 amendments to CERCLA. The United States Senate report on the bill which enacted these amendments noted that the definition of a brownfield was drafted to be consistent with the Federal Environmental Protection Agency’s (EPA) traditional working definition of a brownfield, which as early as 1997, defined a brownfield as an “abandoned, idle or underused industrial or commercial site where expansion or redevelopment is complicated by real or perceived contamination that can add cost, time or uncertainty to a redevelopment project.”
When the Legislature adopted the BCE it rejected competing definitions of “brownfield” proposed in draft bills respectively introduced in the Senate and Assembly, which had respectively sought to broaden or restrict eligibility of environmentally impacted sites to brownfield status. (Cf. proposed ECL 27-1205 [5] in 2003 NY Assembly Bill A7507 with proposed ECL 27-1401 [2] in 2002 NY Senate Bill S7686-A.) This legislative history illustrates that part of the compromises which enabled the *411 BCP to be enacted resulted from the Senate and Assembly resolving their differences on the definition of brownfields by adopting the then available CERCLA definition which was between the proposed expansive Senate definition and the proposed restricted Assembly definition. At oral argument the parties concurred that the Federal CERCLA language is the source of the definition of brownfield in the ECL.
The fact that the quite different Senate and Assembly approaches were resolved by the adoption of the CERCLA definition is compelling evidence that the Legislature had clearly focused on the issue and that the language as finally adopted was not inadvertent. Further, the fact that the definition selected arose from a “settlement” between the two legislative houses evinces a strong legislative intent that the compromise reached should stand and not be subject to material variance by DEC interpretation or regulation, as it would make no sense for either house to agree to a compromise solution where such compromise could be countermanded by DEC. Thus the fact of the compromise is compelling evidence of a legislative intent that the statutory definition was intended to be effective and binding unless and until it was changed by further action of the Legislature.
Accordingly, “complicated” must be construed as having the same meaning it has under CERCLA, and thus under the Federal EPA working definition of a brownfield, where “complicated” means where contamination “can add cost, time or uncertainty to a redevelopment project.”
B. Rule-making Authority
While ECL article 27, title 14, contains no separate provision granting rule-making powers to the DEC, ECL 3-0301 (2) (m) grants DEC a generad power to “[a]dopt such rules, regulations and procedures as may be necessary, convenient or desirable to effectuate the purposes of this chapter.”
Apparently under this authority, DEC adopted and modified regulations relating to the BCE (6 NYCRR subpart 375-3.) The current regulations, effective as of December 14, 2006, include a definition of sites eligible for the BCP under section 375-3.3.
While it is axiomatic that a court must give substantial deference to an agency’s construction of a statute when such statute is primarily to be implemented by such agency, such deference is not without limitation. This court must also address whether DEC’s determination has exceeded the authority granted to DEC under law.
*412 In “this state construction of the laws is the function of the courts and it may not be exercised by the . . . Executive.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 71, Comment at 139.) Accordingly, any DEC power to issue regulations may not contravene the construction put upon the BCP by the courts. Thus, to the extent the “but for” concept represents an administrative determination not adopted by the courts as being supported by title 14, DEC’S interposition of such requirement does not bind this court, or any other court, and is null and void.
C. External Considerations
Statutes also recognizes that under certain special circumstances a court may look beyond the explicit language of the text of a statute to determine the meaning in applying such statute to a case before it. (Statutes § 362.)
These instances, however, presuppose some inherent difficulty in the language of the statute that may render the statute absurd, inoperative or violative of some federal or state constitutional principle, or have an impact diametrically opposed to the statutes’ stated intent. None of these circumstances are present here. At most is the concern of DEC that the BCP program may prove to be more expensive than the present executive branch of the government may wish it to be. While program costs are a proper matter for the Legislature and Executive to address by law or budgetary action, it is not a matter for the courts by “construction” to set the proper expenditure formula or tax credits available for the program. To the extent that the BCP is a “tax statute” in that the controversy here relates principally to the eligibility of East River for certain tax credits, McKinney’s Consolidated Laws of NY, Book 1, Statutes § 313 (Comment at 476) makes it clear that such tax statutes are to “be interpreted as the ordinary person reading them might be led to expect them to be” and, in the event of doubt, to construe matters in favor óf the taxpayer. Under neither principle may the court read in a “but for” test for eligibility to the BCE
Thus, this court finds that the BCP language does not raise issues that would permit or require the court to depart from an analysis and interpretation of the text of the statute and a consideration of precedent.
II. Precedent
Four Supreme Court decisions which directly address DEC’s power to reject applicants to the BCP and to establish standards to do so have been brought to this court’s attention. These *413 cases are 377 Greenwich LLC v New York State Dept, of Envtl. Conservation (14 Misc 3d 417 [Sup Ct, NY County 2006]), Destiny (supra), Matter of HLP Props. LLC v New York State Dept, of Envtl. Conservation (21 Misc 3d 658 [Sup Ct, NY County 2008]) and Lighthouse Pointe Prop. Assoc. LLC v New York State Dept, of Envtl. Conservation (Sup Ct, Monroe County, Dec. 7, 2007, index No. 9731/2007). There are currently no decisions of the Court of Appeals or the Appellate Division on these issues.
In 377 Greenwich, the earliest case, the court upheld DEC’s decision to reject an applicant for BCP status and also validated DEC regulations imposing standards for qualification. In Destiny and HLP Props., the respective courts found that DEC had exceeded its powers under the BCP to exclude properties from the BCP by reason of the application of criteria not set forth in the ECL, expressly rejecting 377 Greenwich’s validation of DEC regulations to such effect. In Lighthouse, the court found that the environmental contaminants on the site exceeded DEC standards and therefore the site was prima facie entitled to entry into the BCE In the decision, the court noted that DEC had discretion to determine whether the contamination was de minimis, so that the site would not qualify for BCP inclusion, but would have to “state the reasoning employed in reaching such a decision.” As DEC stated no such reasons, the court ordered the site to be included in the BCP. As these four cases are all Supreme Court cases, this court is not bound by them but must instead give them “respectful consideration.” (McKinney’s Cons Laws of NY, Book 1, Statutes § 72 [b], Comment at 143-144.) As these cases seem to reach different results on certain issues, an analysis is necessary to explore their facts and reasoning to accord them such “respectful consideration.”
Although there are substantial differences in the reasoning of the courts in these cases and in their underlying facts and even different conclusions as to the power of DEC to impose additional qualifications for BCP entry, this court finds certain common principles in all four cases.
377 Greenwich involved the development of a hotel on a 10,000-square-foot parcel of land in Manhattan which had been used for a parking lot. During the process of development, an environmental consultant discovered two unregistered 550-gallon underground oil tanks and minor soil pollutants on a portion of the site extending to a maximum depth of 14 feet. There was no groundwater pollution. To put these findings in context, standard heating oil tanks for single family homes are com- *414 manly 275- or 550-gallon tanks, and the proposed development required the entire site to be excavated to a depth of 25 feet. Such excavation would have resulted in the full removal of all contaminated soil. Further, although the environmental problems were promptly reported to DEC, DEC considered them to be matters of low priority and left the remediation and soil removal process to the developer for completion and certification but without any requirement of DEC monitoring. DEC rejected the developer’s application for inclusion of the site in the BCP on the ground that the presence of contaminants hardly complicated the development of the site, and therefore did not raise the site to the status of a brownfield under the statutory definition. The court found such determination to be rationally supported. Given the likelihood that virtually any urban site to be redeveloped will have at least a minor degree of environmental problems, the presence of the small tanks and the low level pollutants on the site and the practical ease of their remediation in the construction project without extensive government participation could hardly be said to “complicate” the redevelopment of the site. Further, financing of the site was fully in place, and the removal of the soil in which the pollutants were located which was required by the project would not further delay the project.
While the court’s decision in 377 Greenwich that such DEC determination that the pollutants were minor was sufficient to fully support the dismissal of petitioner’s claims, the court went further to uphold the. DEC’s eligibility guidance manual and its use in the DEC decision against the developer’s challenge which asserted many of the challenges advanced by East River here against the imposition of a “but for” test. As such portion of the court’s determination in 377 Greenwich was unnecessary to support its finding that the low level environmental problems and the concomitant lack of delay and no showing of financing problems definitely did not “complicate” development, such portion of the decision which upheld DEC’s additional criteria is effectively dicta, thus entitling it to less consideration than the holding. The 377 Greenwich court went even further, stating that the applicant’s action to proceed with the remediation and to complete it after application for brownfield status was made, provided another reason for dismissing the petition. This too, was dicta as the court had already agreed with DEC’s determination that the site was never eligible and had already supported DEC’s additional criteria. Accordingly, this additional *415 reason that the remediation had been completed after the application for brownfield status was filed, was unnecessary to the decision.
Destiny and HLP Props., unlike 377 Greenwich, involved sites that had been used for heavy industrial purposes and where the level of contamination was concededly extensive and clearly not routine or de minimis. Because a coal gasification plant had been located on HLP Properties’ site for decades commencing in the nineteenth century, the site was extensively contaminated by a long list of hazardous substances as described at length in the HLP Props, opinion. The Destiny site was also used for various heavy industrial processes, also since the nineteenth century — including a junk yard, a waste disposal site for a chemical manufacturer, a site for mixed fill and a petroleum bulk storage facility. The resulting hazardous chemical pollution created extensive groundwater pollution leaking into the adjacent Onondaga Lake, which the court characterized as having “a storied history of being perhaps one of the most polluted and contaminated lakes in the world.” (2008 NY Slip Op 51161[U], *3.) In both cases, the court expressly disagreed with the dicta in 377 Greenwich and proceeded to find that DEC could not impose additional qualification by administrative rule or guidance on sites for admission to the BCE
Lighthouse (Sup Ct, Monroe County, Dec. 7, 2007, index No. 9731/2007) is a short decision where the site is described only as having been “used for various purposes over the years including a solid waste landfill for the City of Rochester.” While there were contaminants, including ground waste contamination, DEC found that the contaminants were “widely distributed in minimal quantities through the solid waste,” and did not need remediation.
The court found that the contaminants exceeded the level DEC would have required for a release of liability under the BCE and thus their presence may have complicated the development. The court found DEC “offered nothing to the Court to show how” the contaminants would not complicate the project.
As this court must construe the term “complicated” and apply such definition to the case before it, these decisions are useful in providing guidance as to what “complicated” means. In 377 Greenwich, the developers were free to develop without material regulatory delay or interference from DEC, notwithstanding that they, as any developer of any site, had to comply with generally applicable environmental laws. The developers also *416 had financing commitments in place. Accordingly, the court’s finding that the environmental problems did not complicate redevelopment is hardly surprising. However, as in both Destiny and HLP Props., the developers were enmeshed in ongoing and extensive regulatory oversight by the DEC and the sites were heavily polluted former industrial sites. Where the development of a site is subject to significant monitoring and oversight of DEC, the development process will be far more difficult and complicated and subsequent to more delays than where a development is subject only to generally applicable environmental law. Significant monitoring and oversight regularly subject such a development to regulatory delays not applicable to a development free of such regulatory process. CERCLA remediation liabilities which may be imposed on a foreclosing lender further complicate financing of a development of a materially polluted site. Delays may also occur by litigation brought by third parties opposed to development. The inclusion in the CER-CLA definition of perceived contamination imported from the Federal EPA working definition of brownfield reflects the scope of lender liability issues under CERCLA and covers the risk of third-party suits based on perception of contamination which might delay a development as well as possible procrastination or changes in the regulatory standards and theories during the cleanup period. Such delays clearly complicate any development by introducing uncertainties in timing which in turn create problems for a developer in terms of those financing, construction, leasing and sale arrangements which are time-sensitive as to availability, price and enforcement. Where the timing of a development is not subject to such regulatory delay or procrastination, change and uncertainty, a developer can more likely secure fixed price contracts for construction, fixed rate financing commitments, tenants who can commit to leases because they can commence on reasonably certain dates, and buyers who will commit to buy because they know they can take possession of a completed building or unit on a reasonably certain schedule. Thus, in two of the three cases which found the petitioner’s site eligible for BCR treatment over the objection of DEC, substantial delay resulting from environmental conditions were clear and constituted “complications” under the definition of brownfield. In the third case, Lighthouse, the court went even further, putting the burden on DEC to show how the contaminants would not complicate the development in order to exclude a site from the BCE
*417 While Lighthouse does not discuss 377 Greenwich, it is clearly far more skeptical of a DEC finding that contaminants are so de minimis as to present no complications.
Here, this court need not choose between these two cases as there were clearly more than de minimis problems on the sites. Further, the parties’ agreement that this court is merely to decide the “but for” question, makes it unnecessary for the court to address the disagreement between the 377 Greenwich court and the Lighthouse court as to how the DEC may determine that the level of contamination is so de minimis as not to complicate development.
Indirect Precedent
As the four cases directly construing the BCP are not decisions of an appellate court whose decision would bind this court, the parties have also urged upon this court a number of appellate decisions, which although not direct precedent, were argued to be applicable by analogy here.
This court’s review of such cases has not produced any conclusive result on the narrow issue before it, namely, whether title 14 permits DEC to impose a “but for” test or whether it does not.
One dispute which resulted in two Court of Appeals decisions, both under the name of Matter of Trump-Equitable Fifth Ave. Co. v Gliedman (the first at 57 NY2d 588 [1982] and the second at 62 NY2d 539 [1984]), however, does provide indirect precedent as to how the Court of Appeals has assessed a similar issue. Both decisions considered a tax exemption program enacted by Real Property Tax Law § 421-a in 1971 to encourage the development of housing in New York City on “under-utilized land.” In Trump-Equitable the developer of a site at 56th Street and Fifth Avenue sought inclusion of such site in the RPTL 421-a program but the City Department of Housing Preservation and Development (HPD) denied inclusion asserting that HPD defined “under-utilized” to mean that the site had to have been occupied by a “functionally obsolete” building. In fact, the site was occupied by the 12-story Bonwit Teller building which was not functionally obsolete, and which generated substantial revenue. However, as evidenced by the eventual development of the high rise, enormously successful Trump Tower Condominium, on the site, the site was clearly not fully utilized. In their first decision, the Court of Appeals held that HPD could not impose the additional qualification of “functionally obsolete” as a condition of qualifying under the RPTL 421-a program as *418 such condition was not set forth in RPTL 421-a. After remand, HPD modified its regulations to require that an eligible site had to be “substantially” underutilized, and again denied the tax exemption on the ground that the site was not. On second appeal, the Court of Appeals again found that HPD could not restrict access to the program by imposing an additional qualification of “substantially” not present in the statute.
Trump-Equitable is analogous to the case here in that in Trump-Equitable HPD attempted to add qualifications to the statute to prevent what it saw to be a tax “windfall” to a developer who may not have needed the tax program to induce his development. The learning of Trump-Equitable is that an executive agency which feels that the law results in an expensive or “windfall” tax benefit result should return to the Legislature to change the law rather than attempt to change the statute sua sponte.[5] Courts are not to intervene ás protectors of the fisc in tax disputes, but are to address the existing law as it has been adopted by the Legislature.
III. Legislative History
The construction of a statute is to be made from its text which is the operative final action of the Legislature which passes the statute and the Governor who approves it. Where the text is clear, resort to legislative history to vary the text is impermissible. However, in the case here, the legislative history confirms the court’s textual analysis and consideration of precedents, and will be set forth for such confirmatory purposes.
While it has been long recognized that many industrial processes lead to environmental pollution, addressing and reversing the consequences of prior industrial pollution is of a relatively modern vintage which has been accelerated by the environmental movements begun in the 1960s and 1970s. In New York, this movement led to the consolidation of all environmental regulations into the DEC which was established by Laws of 1970 (ch 140), and the enactment of the original ECL by such chapter. In 1990, Congress adopted CERCLA to address, as a federal matter, all environmentally compromised sites, and a Federal Superfund to remediate the nation’s worst sites. In 1979, New York adopted the Inactive Hazardous Waste Disposal Sites Program under ECL 27-1301 et seq., known as *419 the State Superfund, a comprehensive program to address abandoned and inactive sites in the state.
Although the Superfund addressed the most severely polluted sites, it did not address less polluted sites, commonly referred to as brownfields. The cost of cleanup of these brownfield sites was not fundable under either Superfund program, yet liabilities and responsibilities imposed under CERCLA rendered brownfield sites less developable and induced developers and lenders to avoid brownfields and, instead, direct their development and lending activities to “greenfield” sites in the underdeveloped countryside to avoid cleanup and liability problems. This left many brownfields as blights in older cities and neighborhoods, with a concomitant loss of taxes to older cities and restricting of the access of less mobile city residents to employment opportunities.
To address the problem in New York State, in 1994 DEC established the VCP for brownfield sites not included in the Superfund programs. The VCP had limitations, and, in the opinion of many, was not adequate to complete the job.
The Governor subsequently proposed a program bill to enact a state brownfield program to address liability issues and to aid in the costs of remediation through tax credits. The Legislature did not enact the Governor’s proposal, but struggled with its own proposals to address the issue and, eventually drafted, negotiated and adopted the BCP in 2003.
The purpose of the BCR as stated in its purpose clause, was to encourage and expedite the remediation of brownfields to return them to use. Recognizing that too few brownfields were being returned to use under the VCP program, the BCP afforded substantial tax benefits to participants and reduced certain legal exposures for owners of sites who remediated them under BCP rules. Recognizing that a major problem of brownfield redevelopment was the delay imposed on development by regulatory problems, DEC was to expedite the inclusion of applicants into the BCP This intent is clear from the requirement in the statute which required DEC to use its “best efforts” to act on completed applications within 45 days. However clear such legislative charge of expedition, in three reported cases, DEC substantially missed the timetable. In this case, assuming DEC action was evidenced by sending the cleanup agreement, DEC missed the deadline by eight months, taking roughly six times as long as the Legislature wished.
Like many governmental programs enacted after a compromise of competing views, critics and those whose positions were *420 not accepted in the compromise attacked the program as being insufficient or too slow or too rich for participants and too costly to the State.[6] Although the BCP was signed into law by the Governor, the program was not identical to the program proposed by the Governor in his program bill. After the BCP was passed, DEC responded by proposing a series of guidelines to “fine-tune” the program. These guidelines were also attacked by some as reneging on the compromises set by the Legislature. After the 2006 statewide election the new administration adopted some of the positions of some of the critics and sought to make extensive changes to the BCE
Following his inauguration in early 2007, the new Governor proposed a program bill to change the BCP to restrict eligibility and to reduce certain of the tax benefits. Following the introduction on such proposal, on August 27, 2007, the DEC Commissioner, in a presentation on such proposal to the New York Senate and Assembly Committees on Environmental Conservation, explained the Governor’s aims to impose a “but for” test for tax benefits and to reduce and cap them. No relevant legislative changes to the BCP were made in 2007.
In 2008, the Governor took a different approach to effect such changes by including them in a budget bill, submitted to implement his 2008 Executive Budget. Before such budget was adopted, the Governor resigned, and his budget bill was not adopted in connection with the 2008 Executive Budget. In April 2008, the subsequent Governor submitted his program bill to modify the BCP which, inter alla, proposed a “but for” test,[7] imposed caps on the amount of available tax credits for participating sites and made other extensive changes. The Legislature did not adopt such 2008 program bill, but adopted the 2008 amendments to make different changes to the BCP which changes did not include a “but for” test.
*421 The history of an act of the Legislature and the time and surrounding circumstances of its enactment may be relevant to the construction of a statute, to the extent of textual ambiguities. (Statutes § 124.) Although the definition of brownfield in the BCP has remained the same since it was adopted in 2003, the 2008 amendments are relevant, as amendments to an act and the original act are to be construed together. (Statutes § 192.) The “history” of the 2008 amendments thus makes it clear that the Legislature rejected the “but for” test urged by the Governor, confirming that such test was not part of the original BCE Both Governors taking office subsequent to the Governor under whom the BCP was enacted as well as the DEC Commissioner for such two Governors, in official presentations to the Legislature, urged the Legislature to amend the BCP to include a “but for” test in order to reduce the cost to the State of the tax benefits available under the program, as well as make other changes. The centrality of gubernatorial fiscal concerns about the BCP was reinforced by the inclusion of the changes in a budget bill, which is given special status under the New York Constitution because it is introduced to implement the state fiscal plan. (NY Const, art VII, § 3.)[8] In adopting the 2008 amendments, the Legislature accepted as modified some of the gubernatorial proposals from the program and budget bills and modified the formulas for tax credits and imposed caps on the amount of credit permissible for a site, but included no “but for” test. Such action evinces a clear legislative focus on the issues as well as a clear expression of an intent not to impose a “but for” test for admission to the BCE
DEC argues that because 377 Greenwich was decided in 2006, prior to the enactment of the 2008 amendments, it shows that the Legislature felt it was unnecessary to enact a “but for” test because such tests had been validated in such case. However, 377 Greenwich was also decided before the program bills and the budget bill were submitted by the two Governors seeking an explicit “but for” test, which both Governors claimed was needed to reduce the fiscal costs to the State of the BCP program. Further, nothing in the record before this court indicates that the decision in 377 Greenwich was brought to the attention of the Legislature, a sine qua non for any court to consider that such decision was part of the legislative history of *422 the 2008 amendments. In addition, Destiny, which criticized and contradicted 377 Greenwich, was decided on June 10, 2008, also prior to the enactment of the 2008 amendments on July 23, 2008.[9] There is also nothing in the record to indicate the Destiny decision was brought to the attention of the Legislature. Therefore, to the extent 377 Greenwich is to be deemed a part of the legislative history, so must Destiny. Given their diametrically opposite conclusions as to the power of DEC to impose nonstatutory criteria on entry to the BCE the existence of the 377 Greenwich decision cannot support DEC’s contention that the Legislature did not adopt the proffered “but for” test for entrance to the BCP because it considered that such test was already law.[10]
This court is not unmindful of the policy arguments and policy debates among the various governors, legislatures, and bar associations, as well as legal commentary on regulatory theory and the benefits and burdens of subsidy versus administrative programs designed to address the problems of returning environmentally degraded sites to productive use. What is clear from the history is that the debates as to how to do so and how to pay for such cleanup are contentious, continuous and likely to continue. It is, however, the province of the Legislature and not this court, to make such policy decisions. This court may only follow those policy decisions which have been made and have been embodied in law. Accordingly, this court finds no legislative history to support any contention that it was the intent of the Legislature to include a “but for” question on the entrance exam for the BCE
IV Conclusion
The construction of ECL article 27, title 14, and case law as applied to this proceeding, from a textual analysis and case law analysis all make it clear that the decision as it applied to East River’s three sites was arbitrary and capricious and in violation of law by adding a condition not found in or authorized by the statute. Legislative history, a relevant area of reference for the construction of a statute to the extent of any ambiguity or confusion (of which in this case there was none), yields the same conclusion. It has been over eight years since East River applied *423 to the VCP for its sites and over four years since it reapplied to transfer the sites to the BCR had such sites initially accepted thereunder, and the public comment period and the “best efforts” deadline for DEC to accept or reject the site occurred. It has been over three years since DEC delivered the final cleanup agreement to East River. DEC became aware that the final cleanup agreement was executed by East River almost two years ago and delivered to a third-party escrow to be delivered upon condition subsequent, yet after they were delivered from escrow about four months later, DEC took almost six months more to reject its own cleanup agreement.
This history of the process involved in East River’s sites reinforces the court’s conclusion that becoming enmeshed in a governmental regulatory program by reason of environmental problems per se “complicates” redevelopment, as indeed the redevelopment of the three sites had been complicated by adding “cost, time or uncertainty.” While redevelopment of urban sites may not be an instantaneous process, it is clear that the delays to East River’s development of the three sites has been materially different in kind than would have been faced by a developer of sites not involving “real or perceived contamination.” Thus, DEC’s initial action in finding the application complete, and considering that the three sites were to be subject to intense regulation of DEC for many years, as materially compromised sites, delivering a cleanup agreement with strict DEC monitoring and giving no sign of changing its position for 2V2 years, in fact, “complicated” the development of the sites by adding cost, time and uncertainty. This conclusion is reinforced by the holding in 377 Greenwich, which DEC itself claims to be a controlling precedent. In 377 Greenwich, DEC declined to be involved with the remediation required for what DEC deemed to be ordinary and routine environmental issues. Thus, DEC did not, by its own action, render such redevelopment materially distinguishable from any other ordinary redevelopment. As the record did not show that the developer in such case made any other showing of any other “complication” due to the contamination, DEC’s rejection of the developer’s BCP application was properly held to be not arbitrary and capricious.
Remedies
In the usual CPLR article 78 proceeding, where the court finds an agency determination to be arbitrary and capricious, the court sets aside the decision and returns the matter to the *424 agency for action. Here, there is no need to do so as the parties have agreed that the sole issue before the court is whether DEC could impose a “but for” test on the qualification of a site as a brownfield under the BCE As this court’s decision is that DEC could not, the sole reason offered to support the determination fails and, accordingly, the execution and return to East River of the cleanup agreement, as already signed by East River and applicable to the three remaining sites, becomes a ministerial act of DEC, and thus subject to the order of this court.[11] DEC delivered the cleanup agreement to East River for execution and has indicated to this court that its sole reason for rejection of the cleanup agreement by DEC was DEC’s ruling on the “but for” issue. There is no further reason to delay its implementation.
Thus, the court will direct DEC to execute and deliver the cleanup agreement with respect to the three sites to East River.
Although this court has determined that the three sites are eligible for the BCE and that the cleanup agreement is to be executed and delivered by DEC, the entitlement of East River to the ultimate benefits of the BCE for the three included sites will, of course, depend on carrying out its obligations with respect to such sites under the cleanup agreement.
East River also seeks an order of this court that the tax benefits of the BCE be applicable to the three sites without reference to limitations on such benefits imposed by the 2008 amendments. As discussed above, the 2008 amendments imposed new limitations on certain tax benefits available under the Tax Law for participants in the BCE by adding a new paragraph (3-a) to Tax Law § 21 (a). However, such paragraph also “grandfathered” sites already in the BCE by providing that:
“[T]he provisions of this paragraph shall not apply to any qualified site for which the department of environmental conservation has issued a notice to the taxpayer before June twenty-third, two thousand eight that its request for participation has been accepted under subdivision six of section 27-1407 of the environmental conservation law.” (Tax Law § 21 [a] [3-a] [A] [2].)
East River seeks to have its three sites to be declared included in this “grandfather” as their acceptance to the BCE would *425 have and should have occurred “but for” the improper action of DEC in imposing a “but for” test as to eligibility and not returning the executed cleanup agreement in a timely manner. East River asks that this court “specify in its order that for the purposes of the application” (Tax Law § 21 [a] [3-a]), DEC shall be deemed to have notified East River that the three sites had been accepted to the BCP under ECL 27-1407 (6) no later than April 14, 2005.
Under the BCR it is not exactly clear what is the date of acceptance into BCP. ECL 27-1407 sets forth the process and contains certain short time limitations for acceptance or rejection. While ECL 27-1409 sets forth the content of a brownfield site cleanup agreement, the definition of such an agreement merely relates back to such section and indicates that it is “for the purpose of completing a brownfield site remedial program.” (ECL 27-1405 [4].)
Thus, as there could be no cleanup agreement except “to complete a brownfield site remedial program,” delivering a cleanup agreement prepared by DEC to be signed by the applicant could only follow the applicant’s acceptance to the BCE East River is therefore correct that the latest date they should have been deemed to have been accepted into BCP was April 14, 2005 when the cleanup agreement was sent to them.[12] DEC has not addressed East River’s assertion as to when such acceptance date occurred, relying instead on its position that the determination relying on its “but for” analysis was correct and thus, by implication, that East River is entitled no tax benefits at all.
On this issue, this court finds that East River is entitled to the relief it seeks. The determination being arbitrary and capricious, should not result in a loss of tax benefits to East River under circumstances where the Legislature’s clear expression of intent was to grandfather benefits to those who had diligently acted under the original BCP to satisfy requirements for acceptance in the BCE Even to the extent some delay in the process is chargeable to East River, such as for the duration of the escrow, the delivery of the executed cleanup agreement to DEC from escrow clearly occurred prior to the grandfather date. Thus, this court will grant the relief sought by East River with respect to the date of inclusion as consistent with the intent of *426 the Legislature in its enactment of the 2008 amendments to grandfather BCP applicants who had been prompt and assiduous in completing their applications to the program.
Accordingly, it is adjudged and declared that the determination, which excluded East River from the BCP relating to three sites as more fully described in this decision and order, be set aside as arbitrary and capricious and in violation of law, and that it is further adjudged and declared that the earlier action of DEC to accept the three sites which remain the subject of this proceeding for inclusion in the BCP is hereby reinstated, and as the determination has been set aside, such sites shall be and are deemed to be brownfield sites and accepted as such in the BCR and that it is further adjudged and declared that DEC is hereby ordered and directed, within 30 days of the service of notice of entry of this decision and order, to execute and deliver to East River the cleanup agreement as to the three sites in the form heretofore prepared by DEC and executed by East River, modified only to exclude therefrom the fourth site no longer the subject of this proceeding, effective as of a date no later than April 23, 2007 and that for the purposes of Tax Law § 21 (a) (3-a), such date shall be deemed the date that DEC issued a notice to East River that its request for participation in the BCP had been accepted under ECL 27-1407 (6).

. Interview with Dale Desnoyers, Director of Environmental Remediation of DEC (reported in Brownfield News).

. “This volume [Statutes] contains a textual treatise on the construction and legal interpretation of the statutes enacted by the Legislature and contained in the Consolidated Laws” (McKinney’s Cons Laws of NY, Book 1, Statutes, Explanation, at iii).

. See e.g. People v Cruz, 48 NY2d 419 (1979); Eaton v New York City Conciliation & Appeals Bd., 56 NY2d 340 (1982); People v Munoz, 207 AD2d 418 (2d Dept 1994), Iv denied 84 NY2d 938 (1994).

. East River has pointed out a few other New York statutes which use the term, but they are far afield from the ECL or the issues here.

. The Legislature has subsequently modified the RPTL 421-a program from time to time to fine tune its provisions with the intent to address these issues.

. See Bill Jacket, L 2003, ch 1.

. The text of the Governor’s Memorandum in Support of the program bill focuses on the need to control costs and the problem of availability of credits to “developers . . . who would likely redevelop a site in the absence of tax credit incentives,” and later stresses that the proposal would “clarif[y] DEC’S ongoing authority to exclude certain projects from the BCP that would likely be redeveloped in the absence of the tax credits.” (Governor’s Mem in Support, 2008-09 New York State Executive Budget, Revenue Article VII Legislation, Part E, available at http://www.budget.state.ny.us/pubs/archive/ fy0809archive/eBudget0809/fy0809artVIIbills/REVENUEConsBMwtoc.htm [accessed Jan. 8, 2009], cached at http://www.nycourts.gov/reporter/webdocs/ 2008_09_memorandum_in_support_Revenue.htm.)

. Thus, such inclusion represents a statement by the Governor that the addition of the “but for” test constituted part of the implementation of the State’s fiscal plan.

. HLP Props., which also rejected the “but for” approach of 377 Greenwich, was not decided until September 12, 2008, and is thus irrelevant to this analysis of legislative history.

. Although Lighthouse was also decided prior to the 2008 amendments, it did not address the “but for” question explicitly.

. There is no “do over” to create new reasons to deny eligibility. (See Trump-Equitable, supra.)

. This analysis does not address the case where a caught error resulted in a proper rescission of acceptance, as here the parties have agreed the sole issue is DEC’S “but for” position which this court has found to be improper.